**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NEW YORK HOTEL TRADES COUNCIL & HOTEL ASSOCIATION OF NEW YORK CITY, INC. HEALTH BENEFITS FUND and THE DETECTIVES ENDOWMENT ASSOCIATION OF THE CITY OF NEW YORK, | ) ) ) ) ) ) ) ) Civil Action No. |
| Plaintiffs, | ) **CLASS ACTION COMPLAINT** |
| -against- | ) **and DEMAND FOR JURY TRIAL** ) |
| VALEANT PHARMACEUTICALS INTERNATIONAL, INC., ANDREW DAVENPORT, and MATTHEW DAVENPORT, | ) ) ) ) ) |
| Defendants. | ) ) |

1.     Plaintiffs, New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund and the Detectives Endowment Association of New York City (collectively, the "Plaintiffs"), bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on their own behalf and on behalf of a class of similarly situated third party payors ("TPPs") who, from January 2, 2013 through and including October 30, 2015 (the "Class Period"), unnecessarily paid for or incurred excessive costs for pharmaceuticals of Valeant Pharmaceuticals International, Inc. ("Valeant") or the Valeant Enterprise, defined herein, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962.  Plaintiffs also bring this action on behalf of a sub-class of New York-domiciled purchasers who have claims arising from Valeant's misconduct pursuant to New York's Consumer Protection Act, N.Y. Gen. Bus. Law § 349, *et. seq.*

2.      Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.  Plaintiffs' information and belief is based on, among other things, the independent investigation of their counsel. This investigation included a review and analysis of: (i) public reports and news articles; (ii) public filings by Valeant and/or its affiliates with state and federal regulators as well as court documents; (iii) research reports by securities and financial analysts; and (iv) other publicly available material and data identified herein, as well as analysis of Plaintiffs' payments for pharmaceutical products sold by Valeant.  Plaintiffs' counsel's investigation into the factual allegations contained herein is continuing, and many of the facts supporting the allegations contained herein are known only to the Defendants or are exclusively within Defendants' custody or control.  Plaintiffs contend that further substantial evidentiary support will exist for the allegations contained herein after a reasonable opportunity for discovery.

## I.      NATURE OF THE ACTION

3.      During the Class Period, defendant Valeant established and substantially controlled an enterprise of captive pharmacies that regularly and continuously:  (i) charged exorbitant prices for Valeant-branded drugs; (ii) routed prescriptions through its secretly controlled pharmacy network and illegally resubmitted rejected claims for reimbursement through other pharmacies, to make it appear that the claims had not previously been rejected; (iii) illegally or improperly substituted Valeant-branded drugs for generic equivalents that were prescribed and/or should have been dispensed, often by physically altering physicians' prescriptions; (iv) illegally submitted reimbursement claims for prescription refills that were not needed or requested; and (v) secretly waived patient co-pays and offered other incentives to discourage patients from complaining about these deceptive practices and requesting less

2

expensive generic alternatives.  This pattern of fraudulent conduct is referred to herein as the "Valeant Enterprise."

4.      Philidor Rx Services LLC ("Philidor"), a separate legal entity from Valeant but which was created and substantially controlled by Defendants and their affiliates, developed a network of pharmacies that Valeant and Defendants Andrew Davenport and Matthew Davenport knowingly created and also substantially controlled.  Through this captive and secret pharmacy network, Defendants implemented various  "back door" approaches described herein to illegally over-charge TPPs that contracted with the network through Pharmacy Benefit Managers ("PBMs").[1]

5.      The Class and Sub-Class's injuries were exacerbated by Valeant's strategy of aggressively raising the prices of drugs it had acquired from other drug companies.  In 2015 alone, Valeant raised prices on its brand-name drugs an average of 66%, according to a Deutsche Bank analysis - - approximately five times as much as its closest industry peers.[2]  For example, after acquiring the rights to the dermatology drug Noritate 1%, Valeant increased its price by

---

[1] Pharmacy Benefit Managers ("PBMs") act as the agents of TPPs and negotiate with drug manufacturers to secure discount rates on drug prices, which discounts are then passed onto the TPP. PBMs also negotiate contracts with pharmacies to create a chain of retail pharmacies that charge the negotiated prices.  PBMs have the ability to audit pharmacies to ensure the pharmacies are in compliance with the PBM contracts and receive claims from pharmacies that, once approved by the PBMs, are passed on to the TPPs for payment.  Jack Du, "What Is the Pharmacy Benefit Management Industry?" *Investopedia,*  http://www.investopedia.com/articles/markets/070215/what-pharmacy-benefit-management-industry.asp.

In practice, a PBM's role in the prescription process is as follows:  a physician prescribes a drug to a patient; the patient visits a pharmacy to fill the prescription; the pharmacy confirms the patient's coverage information (as provided by a TPP) with the pharmacy benefit manager; the beneficiary pays the copayment and/or the deductible and purchases the drug; the pharmacy seeks reimbursement from the PBM for the remainder of the drug's cost; the PBM then seeks reimbursement from the TPP for payments the PBM made for the patient on behalf of the TPP.

[2] Andrew Pollack & Sabrina Tavernise, "Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawmakers," *The New York Times*, Oct. 4, 2015, http://www.nytimes.com/2015/10/05/business/valeants-drug-price-strategy-enriches-it-but-infuriates-patients-and-lawmakers.html?_r=0.

**212%.**  The Company also increased the price of another dermatology drug, Tagretin gel, by **250%**, from approximately $12,176 at the beginning of the Class Period to over $30,320 by 2015.  Similarly, after acquiring Salix Pharmaceuticals in 2015, Valeant raised the price of Glumetza, a diabetes drug, by more than **800%**.

6.     The chart below provides includes a few examples of the exorbitant price increases Defendants implemented during the Class Period:

### Examples of Valeant Pharmaceuticals Drug Price Increases

**Glumetza (oral anti-diabetic drug for treatment of type 2 diabetes) (Salix acquisition):**

| | |
|---|---|
| Jan. 2013 | $896 (90 1,000 mg. tablets) |
| July 2015 | $10,020 (rights acquired in 1Q2015) |

**Syprine (for Wilson's disease, an inherited disorder that can cause severe liver and nerve damage)**

| | |
|---|---|
| Feb. 2013 | $1,395 (100 250 mg. capsules) |
| July 2015 | $21,267 (rights acquired in 2010) |

**Cuprimine (for Wilson's disease)**

| | |
|---|---|
| Feb. 2013 | $888 (100 250 mg. capsules) |
| Early 2015 | $26,189 (after gradual raises to $6,000 by July 2014) |

**Isuprel (for slow or irregular heart rate) (Marathon acquisition)**

| | |
|---|---|
| Dec. 2013 | $4,489 (25 0.2 ml. ampoules) |
| July 2015 | $36,811 (acquired in early 2015) |

**Mephyton (blot clotting aid)**

| | |
|---|---|
| July 2014 | $ 9.37 per tablet |
| Oct. 2015 | $58.75 per tablet |

**Edecrin (a diuretic)**

| | |
|---|---|
| May 2014 | $470 per vial |
| Oct. 2015 | $4,600 per vial |

**Nitropress (blood pressure drug) (Marathon acquisition)**

Early 2015            $1,346 per vial (a 625% increase after acquisition)

7.      Valeant was able to implement many of these price hikes because it was simultaneously steering patients and physicians away from generic equivalents and toward Valeant-branded drugs through its secretly controlled  network of pharmacies led by Philidor.

8.      The Valeant Enterprise's efforts to avoid the substitution of generic alternatives for expensive Valeant drugs violated statutory and/or contractual mandates to substitute cheaper generic drugs when available.  For example, fourteen states, including Pennsylvania, where Philidor is headquartered, and New York, where the named plaintiffs purchased Valeant-branded drugs require that generic equivalents be substituted for branded drugs.[3]  Contracts between pharmacies and TPPs or their PBM agents also typically require a pharmacy to dispense generic drugs in place of a branded drug when available.  To avoid detection of this illegal practice, by means of mail and wire, Defendants channeled prescriptions for Valeant's drugs through Philidor and a network of seemingly independent retail pharmacies that were in fact secretly owned and/or controlled by one or more of the Defendants thereby causing financial injury to Plaintiffs, the Class and Sub-Class.

9.      To implement this part of their illegal scheme, Valeant formed a network of specialty pharmacies around Philidor formally created on January 2, 2013 - - the first day of the Class Period.  As set forth in greater detail below, Valeant operated and controlled Philidor by, among other things, secretly embedding its own employees on-site at Philidor to ensure that Valeant's illegal sales practices were utilized.  In addition, Defendants Andrew Davenport and

---

[3] The fourteen states included the following significant drug markets:  Florida, Kansas, Kentucky, Massachusetts, Minnesota, Mississippi, Nevada, New Jersey, New York, Pennsylvania, Puerto Rico, Rhode Island, Washington and West Virginia.

Matthew Davenport – Philidor's chief executives and their agents or affiliates – created shell companies owned and/or controlled by Philidor to acquire interests in numerous retail pharmacies, thereby creating a thriving distribution channel for Valeant-branded drugs.

10.     Defendants and their affiliates instructed Philidor employees to engage in various deceptive practices designed to ensure that patients received Valeant-branded (and higher priced) drugs rather than cheaper generic equivalents, including:  manually changing codes on physicians' prescriptions to ensure that those prescriptions would be filled with a Valeant drug rather than a generic equivalent; falsifying pharmacy identification information in invoices for prescriptions; falsifying prescription renewals for reimbursement; using pharmacies within the Valeant Enterprise to enable Philidor to indirectly operate in states where it had been denied a license; and making uniform misrepresentations in advertisements and marketing materials. The Valeant Enterprise had a pattern and practice of using mail and wire to effectuate these practices.

11.     Defendants, through their substantial control over Philidor and its affiliates, knowingly and willfully misrepresented to state regulators the true ownership and control of the captive pharmacies that constituted the Valeant Enterprise to ensure that Valeant could charge supra-competitive prices for its branded drugs and sell Valeant-branded drugs that would otherwise have not been dispensed or purchased at those prices.   Defendants' false representations to regulators were made to enable Defendants to engage in the alleged misconduct that harmed Plaintiffs and other TPPs who unknowingly paid fraudulent claims, or incurred unnecessary costs by providing reimbursement for prescriptions for Valeant-branded drug products.   Those false representations also injured the public at large, as patients unwittingly purchased drugs from pharmacies that were not licensed to dispense the drugs.

12.     By concealing Valeant's relationship with Philidor and its network of pharmacies, as well as the pharmacies' relationships to each other, Defendants were able to spread claims across seemingly unrelated pharmacies and avoid scrutiny and denials of reimbursement claims by TPPs and PBMs for failure to substitute generics.  In short, Defendants' practices created the false impression that scores of pharmacies had independently determined to dispense Valeant's high-priced drugs for legitimate medical reasons and enabled Valeant to charge exorbitant prices at the expense of TPPs and consumers.  Neither Philidor nor any of the other captive pharmacies in Philidor's network disclosed their relationship with Valeant to TPPs or their agents – PBMs with whom they were negotiating contracts, and to whom they were certifying audits and submitting reimbursement claims.

13.     The Valeant Enterprise would not have succeeded absent the concealment of Valeant's relationship to Philidor and the secretly controlled network of pharmacies and the submission of fraudulent claims for reimbursement and payment.  Had Plaintiffs and other TPPs or PBMs known the truth, they would have denied claims submitted by pharmacies in the Valeant Enterprise and insisted on the substitution of generic equivalents.  Thus, Valeant took extreme measures to hide its relationship with and ownership interest in Philidor until outside pressure from investors and journalists forced Valeant to reveal its close ties to the Philidor pharmacy network in October 2015.

14.     An online article published by *The Wall Street Journal* on October 25, 2015, entitled "Valeant and Pharmacy More Intertwined Than Thought" reported that Valeant employees were working at Philidor's offices and using fictitious names when sending emails from a Philidor address.  The article specifically mentioned Bijal Patel, who, on a LinkedIn page, was identified as a Manager of Access Solutions at Valeant.  Patel, however, actually worked out

of Philidor's Phoenix-area office using a false identity, and sent emails to Philidor employees using the fictitious name "Peter Parker."  These emails detailed how many prescriptions Philidor was filling, which drugs were most popular and what doctors were the biggest prescribers. According to the *Journal* article:

> Interviews with former employees, doctors who prescribe Valeant drugs and patients indicate that the ties between Valeant and Philidor are more interconnected than previously disclosed.  **The people gave details of how the companies worked together, with Valeant employees working directly in Philidor offices, sometimes using fictional names.  The people said this was to conceal the ties so it didn't appear Valeant was using the pharmacy to steer patients to the drug company's products**, which Philidor strongly denied. (Emphasis added).

These tactics enabled Valeant to obtain reimbursements that would otherwise have been denied for certain pharmaceuticals.

15.     The *Journal* article further reported that doctors who had prescribed Valeant pharmaceutical products said that the Company made them well aware of the services provided by Philidor, including financial support available to patients, while concealing its relationship to Philidor.  Three doctors reportedly said that Valeant sales representatives furnished brochures and coupons offering to help pay for co-pays and directing patients to call a number for Philidor.  According to the *Journal* article:

> . . . doctors would send prescriptions for Valeant drugs electronically to Philidor.
>
> Once Philidor received the prescription, the pharmacy then called the patients to collect their credit-card number and a mailing address to ship the drug, according to three former employees. . . .
>
> \*     \*     \*
>
> If the insurer asked a doctor to explain why the patient needed a costlier Valeant drug rather than a less-expensive alternative, Philidor employees would sometimes fill out the paperwork for the doctor, two of the employees said. . . .

16.     According to an article entitled "The King's Gambit: Valeant's Big Secret" published by The Southern Investigative Reporting Foundation ("SIRF"), a declaratory

judgment lawsuit brought by R&O Pharmacy LLC ("R&O") was filed against Valeant after R&O received a repayment request for $69.8 million based on alleged "invoices" that **Valeant** sent to R&O, **even though R&O had not done any business, at least directly, with Valeant**. The article asserted that Philidor had evidently sent invoices to R&O, but that Philidor had gone to great lengths to conceal its relationship with Valeant.  The R&O lawsuit brought to light a great deal of information previously concealed by Valeant, Philidor, their affiliates and employees.

17.    Citron Research released a report on October 21, 2015, asserting that Valeant controlled both Philidor and R&O.  The Citron report noted certain similarities between the respective websites of Philidor and R&O (as well as other captive pharmacies, described herein) and asserted that they were effectively the same company.  The Citron report also questioned Valeant's practice of rapid acquisitions and massive price increases, noting:

> Just four days ago in the world of Valeant, no one had ever heard of Philidor RX. Recent concerns about [Valeant] focused on its unsavory business practices of massive prices raises on pharmaceuticals acquired in a rapid succession of acquisitions, while slashing research and development.  But no one had discussed how these drugs were distributed … until this week.[4]

18.    On October 29, 2015, the country's three largest PBMs -- CVS Caremark, Express Scripts, and UnitedHealth Group's Optum Rx – all announced that they were dropping Philidor from their pharmacy networks and would no longer pay for drugs dispensed by Philidor.  CVS stated that audits found that Philidor was not complying with terms of its agreement.  Express Scripts stated that, not only was it cutting off Philidor, it was also evaluating four additional pharmacies with which Valeant "has a similar relationship."  After

---

[4] Citron Research, "Valeant – Could this be the Pharmaceutical Enron?" Oct. 21, 2015, http://www.citronresearch.com/wp-content/uploads/2015/10/Valeant-Part-II-final-d.pdf.

these announcements, Valeant reported that it was "severing all ties" with Philidor and that Philidor had "informed Valeant that it will shut down operations as soon as possible."

19.     Valeant consistently and falsely minimized the dramatic price increases charged for its drugs and understated the extent to which they contributed to the Company's overall sales growth.   For example, during an April 29, 2015 earnings conference call, Valeant's Chief Executive J. Michael Pearson ("Pearson") was asked how much price contributed to sales growth in that quarter.   He falsely responded that "In terms of price volume, actually, volume was greater than price in terms of our growth."   On February 2, 2016, Valeant issued a press release **admitting that this statement was false** and that Valeant's growth was a result of its increasing the price of its drugs.[5]

20.     Numerous federal and state entities have conducted investigations concerning Valeant's illicit practices, including its price hike strategies as well as its undisclosed relationship with Philidor and other pharmacies within its captive pharmacy network.   Among those, the U.S. Senate Special Committee on Aging (the "Special Committee") issued subpoenas requiring Valeant to furnish documents and called for testimony with respect to Valeant's dramatic price increases and the captive network of pharmacies that has allowed the Valeant Enterprise to flourish – much of which has been made publicly available.   Valeant also revealed on October 14, 2015 that it had received subpoenas from federal prosecutors seeking information related to how it priced drugs, distributed them and helped patients afford the medicines.   This was after reporting that Valeant had received subpoenas from U.S. Attorney's offices in the Southern District of New York and in Boston.

---

[5] Charley Grant, "Valeant's Sales Growth: Driven by Price Increases or Volume Growth?" Feb. 2, 2016, *The Wall Street Journal*, http://blogs.wsj.com/moneybeat/2016/02/02/valeants-sales-growth-driven-by-price-increases-or-volume-growth/.

21.     And most recently, on August 10, 2016, *The Wall Street Journal* reported that federal prosecutors were investigating whether Valeant "defrauded insurers by shrouding its ties to a mail-order pharmacy that boosted sales of its drugs."[6]

## II.     JURISDICTION AND VENUE

22.     The Court has federal question subject matter jurisdiction over this action because it arises under the Racketeer Influenced and Corrupt Organizations Act. *See* 18 U.S.C. § 1964; 28 U.S.C. § 1331.  The Court also has subject matter jurisdiction over this action by virtue of the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action where the matter in controversy exceeds $5,000,000, and at least one member of the Class and Sub-Class of plaintiffs is a citizen of a State different from that of any Defendant.

23.     The Court has supplemental jurisdiction over state law claims pursuant to 28 U.S.C. § 1367.

24.     The Court has personal jurisdiction over all Defendants pursuant to 18 U.S.C. § 1965(b) and (d).

25.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events, omissions and misconduct giving rise to claims alleged herein occurred in this District.  Plaintiffs are citizens of, reside in, and provided reimbursement for Valeant-branded products in this District.  Moreover, Defendants distributed, advertised and sold Valeant-branded prescriptions in this District.

---

[6] Jacquie McNish and Christopher Matthews, "Valeant Under Criminal Investigation," *The Wall Street Journal*, Aug. 10, 2016, http://www.wsj.com/articles/valeant-under-criminal-investigation-1470868752.

III.    **PARTIES**

A.    **PLAINTIFFS**

26.    Plaintiff, New York Hotel Trades Council & Hotel Association of New York City, Inc. Health Benefits Fund, ("NYHTC") is a jointly-trusteed employee benefits fund which operates for the benefit of active and retired unionized hotel workers in the New York metropolitan area.  NYHTC has its principal place of business at 305 West 44th Street, New York, New York, 10036 and is a citizen of New York.  During the Class Period, NYHTC provided reimbursement for some or all of the purchase price of overpriced and/or illegally dispensed Valeant-branded drugs.  On information and belief, during the Class Period Defendants wrongfully overcharged NYHTC and/or charged NYHTC for unnecessary or unauthorized prescription drugs through the operation and control of the Valeant Enterprise described herein.  As a result, NYHTC has been injured in its business and property.

27.    Plaintiff, the Detectives Endowment Association of the City of New York ("DEA") is the second largest labor union representing police officers of the New York City Police Department.  The DEA was founded in 1917 to represent active and retired detectives of the New York City Police Department.  The DEA represents 5,500 active and 12,000 retired New York City Police Detectives.  The DEA has its principal place of business at 26 Thomas Street, New York, New York 10007.  During the Class Period, DEA paid some or all of the purchase price for Valeant-branded drugs.  On information and belief, between January 2, 2013 and October 30, 2015, Defendants wrongfully overcharged DEA and/or charged DEA for unnecessary or unauthorized prescription drugs through the operation and control of the Valeant Enterprise described herein.  As a result, DEA has been injured in its business and property.

B.      DEFENDANTS

28.     Defendant Valeant is incorporated in Canada and maintains its U.S. headquarters in Bridgewater, New Jersey at 400 Somerset Corporate Boulevard.  Valeant is one of the largest pharmaceutical companies in the United States.  It markets various prescription pharmaceuticals, over-the-counter products, and medical devices throughout the world.

29.     Andrew Davenport was, at the time it ceased operations, the Chief Executive Officer of Philidor, the entity at the heart of the Valeant Enterprise.  Andrew Davenport, reportedly one of Philidor's co-founders, also worked at BQ6 Media Group, a marketing firm that had provided services to Medicis Pharmaceutical Corporation ("Medicis"), which was acquired by Valeant in December 2012.  After Valeant's acquisition of Medicis, Andrew Davenport collaborated with certain Valeant employees including Bijal Patel, Gary Tanner and Alison Pritchet, to establish Philidor.

30.     Matthew S. Davenport, reportedly the brother of Andrew Davenport, represented himself as Philidor's Chief Executive in documents submitted to the California State Board of Pharmacy in support of Philidor's applications for a pharmacy license in California between 2013 and 2015.  In May 2014, the California State Board of Pharmacy denied Philidor's application on the grounds that Matthew Davenport, under penalty of perjury, "knowingly made false statements of fact with the intent to substantially benefit [himself] or others on [Philidor's] application for licensure."  Notably, some of those false statements related to the ownership and management of Philidor, including concealing Andrew Davenport's ownership interest in Philidor.

## C.      RELEVANT NON-PARTIES

31.     Philidor is a now-defunct entity that held itself out as a specialty pharmacy. Philidor was a Delaware corporation that maintained its corporate headquarters at 330 South Warminster Road, Hatboro, Pennsylvania.  As detailed below, Philidor was a central figure in the Valeant Enterprise and was largely responsible for helping expand the secret network of pharmacies used to carry out its fraudulent scheme.  Per ¶ 53 below, there were at least 8 pharmacies within Philidor's network of captive pharmacies.  When it closed down in November 2015, Philidor disclosed to the Pennsylvania Bureau of Workforce Development that Valeant was its only client.  Indicative of establishing an enterprise, Defendants created companies, including Philidor, named after various chess moves and strategies.[7]

32.     At the time Philidor registered to do business in North Carolina, among the officers it identified, and who remain listed on the website of North Carolina's Secretary of State, are:  Andrew J. Davenport, Matthew Davenport, End Game Partnership, L.P., David Wing, and Edward John Carne.[8]  Many of these individuals also held positions at BQ6 Media Group, among other Valeant affiliates.

33.     In addition to Philidor and Valeant (which were separate legal entities), the Valeant Enterprise was comprised of other Delaware entities (each of which also had a chess-themed name), that were used to further extend Valeant and Philidor's reach, including:

   a.  **KGA Fulfillment Services, Inc.** ("KGA"):   KGA was a wholly owned Valeant subsidiary that paid $100 million for the option to acquire Philidor at no further cost

---

[7] The "Philidor Defense," for example, refers to an opening chess move named after a famous 18th-century player.

[8] North Carolina Department of the Secretary of State, Limited Liability Company Information: "Philidor Rx Services LLC," https://www.sosnc.gov/Search/profcorp/10657029.

besides "incentive" payments, hinged to sales of Valeant products, in December 2014.  Thereafter, Valeant began to roll Philidor's financials into its own.[9]

b. **BQ6 Media Group** ("BQ6"):  BQ6 purported to be a marketing firm that consulted for Valeant and had previously provided services to Medicis.  BQ6 identified Matthew Davenport, David Wing, John Carne and Gregory Blaszczynski as its officers, each of whom was also identified as an officer of Philidor.[10]  As noted above, Matthew Davenport also was one of Philidor's founders and was found to have knowingly lied on Philidor's application for a California pharmacy license and determined to have been "guilty of unprofessional conduct" by the California State Board of Pharmacy.

c. **End Game Partnership L.P.** ("End Game"):  End Game owned a 31.5 percent stake in Philidor.  According to SIRF, End Game also shared Andrew Davenport's home address.[11]

d. **Lucena, LLC** ("Lucena"):   Lucena was formed as a Delaware limited liability corporation in July 2014.   Lucena's Certificate of Formation as a Delaware Corporation, identifies Matthew Davenport as an "Authorized Person."  Lucena's chief executive, Sherri Leon, identified herself through LinkedIn as Philidor's Director of Pharmacy Operations from August 2013 through 2015 (her LinkedIn profile has since been removed).  In September 2014, Lucena acquired a 10 percent interest in California-based West Wilshire Pharmacy.

e. **Isolani, LLC** ("Isolani"):  Isolani was a Delaware corporation formed in January 2013 with Eric Rice, Philidor's Senior Director of Call Center Operations as its sole member.  As discussed below, Isolani was created for the sole purpose of acquiring California-based R&O.

f. **Back Rank LLC** ("Back Rank"):  On April 23, 2015, Philidor created Back Rank, LLC, a Delaware limited liability holding company.[12]   Back Rank's managing member was identified as James R. Fleming, also Philidor's Controller; Back Rank shared a common address with both Philidor and BQ6.  On or about June 2015, James Fleming filed an application with the Texas Board of Pharmacy seeking to replace Segun Azeez Audu as the managing officer of Orbit Pharmacy.

---

[9] Michael Rapoport, "Valeant Provides More Restatement Details," *The Wall Street Journal*, Mar. 21, 2016, http://www.wsj.com/articles/valeant-provides-more-restatement-details-1458595922.

[10] Roddy Boyd, "The King's Gambit: Valeant's Big Secret," Southern Investigative Reporting Foundation, Oct. 19, 2015, http://sirf-online.org/2015/10/19/hidden-in-plain-sight-valeants-big-crazy-sort-of-secret-story/.

[11] *See* Boyd, *supra* note 10.

[12] Department of State: Division of Corporations, State of Delaware, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (note: to access entity details, type in entity name "Back Rank, LLC" and file number "5734403" into General Information Name Search fields).

34.     J. Michael Pearson ("Pearson") was Valeant's Chief Executive and a member of its board of directors from 2008 until May 3, 2016.  Pearson also served as Chairman of the Board from March 2011 until January 2016 when he began a medical leave of absence.  In the eight years Pearson served as Valeant's CEO, the Company went on what has been referred to as a "debt fueled acquisition spree," acquiring 100 companies."[13]

## IV.     COMMON FACTUAL ALLEGATIONS

### A.     The Valeant Enterprise

35.     A central feature of Valeant's business strategy was the purchase of companies that had successfully developed and had an existing portfolio of commercially available drugs, including in particular drugs that were less susceptible to competitive and/or reimbursement pressures.

36.     Valeant sought to acquire, for example, drugs designated by the FDA as "orphan drugs" pursuant to the Orphan Drug Act.  An orphan drug is either:  (i) used to treat diseases or conditions that afflict a small portion of the population (200,000 persons or less in the U.S.); or (ii) a drug whose sponsor has shown that the drug's sales are unlikely to be sufficient to recoup the sponsor's costs.  As a result of these characteristics, orphan drugs generally face little, if any, competition.  As an outside consultant reportedly explained to Valeant's CEO, products that "are not on the radar" have "material pricing potential."[14]

---

[13] Bethany McLean, "The Valeant Meltdown and Wall Street's Major Drug Problem," *Vanity Fair: Hive*, Summer 2016, http://www.vanityfair.com/news/2016/06/the-valeant-meltdown-and-wall-streets-major-drug-problem.

[14] Linette Lopez, "A Government Document Dump Just Confirmed the Ugliest Things Wall Street Didn't Want to Believe about Valeant," *Business Insider*, Feb. 2, 2016, http://www.businessinsider.com/valeant-house-documents-show-pricing-strategy-2016-2,

37.     By pursuing this strategy, Valeant not only avoided massive research and development costs but, more importantly focused on "premium" pricing to maximize revenues. Indeed, one of Pearson's mottos was reportedly *"[d]on't bet on science—bet on management."*[15] In order to successfully implement and maintain ultra-premium pricing, however, Valeant had to devise a means of steering physicians and their patients away from less expensive generic alternatives and into Valeant-branded drugs.

38.     How Valeant chose to implement this strategy has been harshly criticized.  Earlier this year, Munger declared that Valeant was a "sewer," adding that "those who created it deserved the opprobrium they got."[16]

39.     Valeant's acquisition spree enabled the Company to record tremendous year-over-year revenue growth.  As set forth in Valeant's Forms 10-K, Valeant's revenues more than quadrupled from $2.4 billion in 2011 to $10.4 billion in 2015.

---

[15] *See* McLean, *supra* note 13.

[16] "Jennifer Ablan & Trevor Hunnicutt, "Buffett, Munger Slam Valeant; Drugmaker Turned into 'A Sewer'," *Reuters*, April 30, 2016, http://www.reuters.com/article/berkshire-buffett-valeant-idUSL2N17X0I4.

40.     During this time frame, Valeant's most notable acquisitions included:[17]

| DATE | ACQUISITION |
|------|-------------|
| 2010 | Biovail |
| 2011 | PharmaSwiss, AB Sanitas, Afexa Life Sciences, Dermik |
| 2012 | Medicis Pharmaceutical Corp. |
| 2013 | Bausch & Lomb |
| 2015 | Salix Pharmaceuticals, Sprout Pharmaceuticals |

41.     Its acquisition of Biovail in 2010 gave Valeant access to an array of dermatological drugs and drugs treating central nervous system disorders.  Through the acquisition of Bausch & Lomb, Valeant expanded into specialized ophthalmology and contact lens markets and, upon acquiring Salix, Valeant accessed the market for drugs designed to treat gastrointestinal disorders.[18]

42.     Valeant acquired Medicis, a dermatological company, in 2012. The Medicis acquisition had two purposes:  first, to acquire and sell Solodyn and Ziana; and second, to begin a pilot program for Philidor to begin distributing Valeant products.[19]

---

[17] Ransdell Pierson, "Timeline – Deals, and doubts, mark Valeant's acquisition history," *Reuters*, Oct. 26, 2015, http://www.reuters.com/article/valeant-pharmacies-timeline-idUSL1N12N1PL20151026; Natalie Grover, Caroline Humer and Ransdell Pierson "Valeant to buy 'female Viagra' maker Sprout Pharma," *Reuters*, Aug. 20, 2015, http://www.reuters.com/article/us-sproutpharmaceuticals-m-a-valeant-pha-idUSKCN0QP09F20150820.

[18] Alex Wayne, "Valeant Agrees to Buy Bausch & Lomb in $8.7 Billion Deal," *Bloomberg News*, May 28, 2013, http://www.bloomberg.com/news/articles/2013-05-27/valeant-agrees-to-buy-bausch-lomb-for-4-5-billion-cash; Crayton Harrison, *Salix Picks Sweeter $11 Billion Valeant Bid as Endo Withdraws*, *Bloomberg News*, March 16, 2015, http://www.bloomberg.com/news/articles/2015-03-16/valeant-boosts-salix-offer-to-173-shr-cash-from-158.

[19] Valeant Pharmaceuticals International, Inc., "Investor Conference Call," Oct. 26, 2015, http://ir.valeant.com/~/media/Files/V/Valeant-IR/reports-and-presentations/10-26-15-investor-presentation.pdf.

B.    The Evolution of the Valeant Enterprise

1.    Philidor is Established and Expands Valeant's Captive Pharmacy Network

43.    On January 2, 2013, the first day of the Class Period, Philidor was formed and purported to operate as an independent specialty pharmacy led by co-founder Andrew Davenport.

44.    In its state registrations, Philidor falsely identified David Wing, John Carne and Gregory Blaszczynski as officers; none actually worked at Philidor.  Rather, each of these individuals worked at BQ6 Media, a pharmaceutical marketing company that consulted for Valeant and shared its physical address with Philidor.  Philidor's owners, Andrew Davenport, Matthew Davenport and Greg Blaszczynski, also worked at BQ6 Media.

45.    The designation "specialty pharmacy" is for pharmacies that offer medications to treat complex, chronic or rare conditions where the drugs are high-cost and require special storage requirements such as refrigeration and administration through injection or inhalation.[20]

46.    Specialty pharmacies act as mail-order pharmacies that operate across state lines and are required to be licensed in any state where they sell drugs.[21]  Specialty pharmacies offer a convenient and reliable service for expensive drugs, which ostensibly lower costs and maximize insurance reimbursements from companies that cover the drug.[22]  However, specialty pharmacies

---

[20]  American Pharmacists Association (APhA), "Specialty Pharmacy," 2016, https://www.pharmacist.com/specialty-pharmacy.

[21]  U.S. Dept. of Justice Drug Enforcement Administration Office of Diversion Control, "Pharmacist's Manual," at 7, Revised 2010, http://www.deadiversion.usdoj.gov/pubs/manuals/pharm2/pharm_manual.pdf ("Every pharmacy that dispenses a controlled substance must be registered with the DEA. First, a state license must be obtained.").  *See also* Specialty Pharmacy Certification Board:  "Pharmacists are required to be licensed on the state level."  http://www.spcboard.org/certification.

[22]  Charles Ornstein, "Documents Raise New Questions About Valeant's Pharmacy Relationships in California," *Pro Publica*, Oct. 22, 2015, https://www.propublica.org/article/documents-raise-questions-about-valeant-pharmacy-relationships-california.

are not required to report their pharmaceutical sales to IMS Health, a tracking service that is used by companies and analysts to monitor drug sales and inventory channels.[23]   Thus, Philidor's specialty pharmacy designation allowed Valeant to avoid public scrutiny of the price-gouging scheme that was directed at consumers and injured TPPs, and which became the central motivation of the Valeant Enterprise.

47.   Philidor opened offices in Arizona and entered into a Master Service and Pharmacy Dispensing Agreement with Valeant's Medicis division on January 11, 2013.  As a result, although its headquarters were just outside of Philadelphia, Pennsylvania, Philidor also immediately began operating in Arizona.

48.   Several Valeant employees, including Gary Tanner, worked with Andrew Davenport in setting up and expanding Philidor's operations.[24]  Gary Tanner, formerly a Medicis employee, reported to the highest-level executives at Valeant.  Tanner's supervisor was Laizer Kornwasser who in turn, reported directly to Pearson, Valeant's then-Chief Executive.[25]

49.   On July 27, 2013, Philidor entered into a "Distribution Services Agreement" with Valeant to provide distribution services for all of Valeant's drugs.  This agreement was amended just a few weeks later on August 2, 2013 to assign Philidor the role of administering Valeant's "co-pay assistance programs," related to Valeant-branded pharmaceuticals.  Gary Tanner was designated as the Valeant contact in the agreement.

50.   To avoid detection as Valeant employees, and thereby conceal the fact that Valeant was using Philidor to steer patients to Valeant-branded drugs, Tanner and his former

---

[23] *See* Ornstein, *supra* note 22.

[24] Carl O'Donnell, "Insight – Valeant Played a Key Role in Building, Operating Philidor RX," *Reuters*, Nov. 12, 2015, http://www.reuters.com/article/valeant-pharmacies-officers-idUSL1N1361N720151112.

[25] *See* O'Donnell, *supra* note 24.

Medicis colleagues, Bijal Patel and Alison Pritchet, used pseudonyms such as Peter Parker (Patel) from Spiderman and Brian Wilson (Tanner) of the Beach Boys.[26]  Patel communicated information to Philidor employees, including the number of prescriptions Philidor filled, the most popular drugs, and physicians that prescribed the greatest amount of drugs.[27]  These Valeant employees, secretly embedded in Philidor, even used email addresses that belonged to Philidor.[28]

51.     In August 2015, Tanner left Valeant to formally join Philidor as Executive Vice President and member of its management team.  Andrew Davenport memorialized Tanner's prior role by sending a memo to employees describing Tanner as "our client liaison with Valeant since the very beginning in January 2013," going on to note that Tanner had "made an immeasurable contribution to Philidor's success."

52.     With the assistance of Valeant employees, Philidor began to acquire and oversee a secret pharmacy network.  The Canadian publication, *The Globe and Mail*, depicted their relationships in the graphic below:[29]

---

[26] Jonathan Rockoff & Jeanne Whalen, "Valeant and Pharmacy More Intertwined Than Thought," *The Wall Street Journal*, Oct. 25, 2015, http://www.wsj.com/articles/valeants-ties-to-pharmacy-scrutinized-1445817449.

[27] *See* Rockoff & Whalen, *supra* note 26.

[28] *See* Rockoff & Whalen, *supra* note 26.

[29] Murat Yukselir, "Valeant's Chess Game" (graphic), *in* "Valeant's Sales Network: Deciphering a Complex Web of Companies," *The Globe and Mail*, Oct. 27, 2015, http://www.theglobeandmail.com/report-on-business/valeants-sales-network-the-firms-and-chess-terms-tied-to-it/article27009058/.



53.    Included within Philidor's network of captive pharmacies were:  Cambria Pharmacy, West Wilshire Pharmacy, R&O Pharmacy, LLC (""R&O"), SafeRx Pharmacy, Orbit Pharmacy, D&A Pharmacy, and Prescriptions Shoppe.[30]

54.    In addition to concealing the close ties between its employees and Philidor, Valeant also intentionally hid its financial ties with Philidor's pharmacy network.  As SIRF observed, "Philidor has gone to great lengths to conceal its ownership."[31]

55.    Valeant orchestrated its option to purchase Philidor by creating a subsidiary, KGA, which it formed in November 2014 claiming that the entity's existence was exclusively for the purpose of holding Valeant's option.[32]

---

[30] *See* Rockoff & Whalen, *supra* note 26; U.S. Senate Aging Committee Documents, *supra* note 26, at AGING-000201 and 000211; Caroline Chen & Ben Elgin, "Valeant's Philidor Used 'Back Door' Tactics to Boost Payments," *Bloomberg News*, Oct. 28, 2015, http://www.bloomberg.com/news/articles/2015-10-29/valeant-s-philidor-used-back-door-tactics-to-boost-payments; Robert Langreth & Esme Deprez, "The Tiny Pharmacy at the Center of Valeant's Money Mystery," *Bloomberg News*, Oct. 29, 2015, http://www.bloomberg.com/news/articles/2015-10-29/valeant-sales-web-emerged-after-druggist-flagged-mystery-scriptsl.

[31] *See* Boyd, *supra* note 10.

56.    What was not publicly disclosed, but has since been reported by SIRF, is that KGA was "listed as the 'secured party' on UCC–1 liens placed in January and February 2016 against the members of Philidor's ownership group. These liens are the public notice that a lending entity may have an interest in the debtor's personal property.  In this case, Valeant/KGA lent money to Philidor's ownership group and accordingly, the ownerships group's equity stakes in Philidor are potentially collateral."[33]

57.    On December 15, 2014, through KGA, Valeant paid $100 million for an option to purchase Philidor any time in the next 10 years for $0, plus various payments based on Philidor's sales.  Valeant also secretly began consolidating Philidor's financials into its own.[34]

58.    Valeant's leadership secretly controlled Philidor from its inception to operate the Valeant Enterprise.  Only belatedly did Valeant reveal that it had oversight of Philidor operations in the following ways: (i) oversight with a joint steering committee; (ii) authority to approve key positions at Philidor; (iii)  ability to perform internal audits on Philidor; and (iv)  rights and access to information.[35]

59.    On December 15, 2014, Valeant and Philidor also amended their prior Distribution and Services Agreement to provide Valeant access to Philidor to inspect Philidor's policies and procedures and to conduct site visits to verify Philidor's compliance.

60.    So firm was Valeant's insistence on using Philidor as its pharmacy network, that when Valeant acquired Sprout, it immediately canceled Sprout's existing distribution agreement

---

[32] *See* Boyd, *supra* note 10.

[33] *See* Boyd, *supra* note 10.

[34] Drew Armstrong, Benjamin Elgin & Caroline Chen, "Valeant Said to Have Planned Philidor Expansion for Products," *Bloomberg News*, Nov. 4, 2015, http://www.bloomberg.com/news/articles/2015-11-04/valeant-said-to-have-planned-philidor-expansion-before-shutdown.

[35] *See* "Investor Conference Call," *supra* note 19.

for Sprout's marquee product with Cardinal Health in favor of using Philidor. This distribution channel closed in late October 2015.[36]

### 2. The Valeant Enterprise Causes its Affiliated Pharmacies to File False Applications with State Pharmacy Boards

61. On or about August 15, 2013, Philidor requested a permit to operate its pharmacy in California. Matthew S. Davenport, Philidor's CEO, submitted the application for licensing and certified that "all statements, answers, and representations" in the application were truthful. The California Board of Pharmacy' executive officer, Virginia Herold, told *Bloomberg News* that fewer than 1% of such applications are denied.[37]

62. However, on or about May 16, 2014, the California Board of Pharmacy denied Philidor's license. The Board concluded that Philidor and Matthew Davenport had "made false statements of fact with the intent to substantially benefit [themselves] or others," and had "failed to comply with Pharmacy Laws." The Board also found that Philidor and Matthew Davenport had lied when identifying Philidor's owners and their equity stakes, its accountant and authorized signatories for financial transactions.[38] The Board labeled Davenport as "guilty of unprofessional conduct" because of his false submission.

### a. Philidor Establishes Lucena to Acquire a Stake in West Wilshire Pharmacy

63. Having failed to obtain a California license, Philidor next turned its efforts to acquiring a California-based pharmacy to gain access to that market. Philidor formed Lucena

---

[36] Katie Thomas & Gretchen Morgenson, "The Female Viagra, Undone by a Drug Maker's Dysfunction," *The New York Times*, April 9, 2016, http://www.nytimes.com/2016/04/10/business/female-viagra-addyi-valeant-dysfunction.html?_r=0.

[37] *See* Langreth & Deprez, *supra* note 30.

[38] *See* Ornstein, *supra* note 22.

Holdings LLC as a limited liability company in Delaware on or about July 31, 2014.[39]  Lucena's Certificate of Formation as a Delaware Corporation identifies Matthew S. Davenport, Philidor's chief executive, as an "Authorized Person."   Lucena's chief executive officer, Sherri Leon, identified herself through LinkedIn as Philidor's Director of Pharmacy Operations from August 2013 through 2015 (her LinkedIn profile has since been removed).

64.     In September 2014, Lucena acquired a 10 percent interest in Brighton Way Pharmacy, doing business as West Wilshire Pharmacy.

65.     On or about September 24, 2015, Ms. Leon filed a Change of Permit Request with the California State Board of Pharmacy on West Wilshire Pharmacy and Lucena's behalf.  The Lucena application identified Philidor's bookkeeper, accountant and signatory for financial transactions, Gregory W. Blaszczynski as an owner.  Blaszczynski also is the Chief Financial Officer of BQ6, which in turn, is one of the employers associated with Matthew S. Davenport.

66.     Absent from the application was any disclosure that Ms. Leon was a Philidor employee; nor did Leon disclose Blaszczynski's ownership in Philidor.  Although a required field on the application, Ms. Leon concealed that she was associated with Philidor, which had been denied a Board license just months earlier.  Yet, attached to Lucena's application was its Certification of Formation under Delaware Law, with Philidor's CEO signing as an "Authorized Person."[40]

---

[39] *See* Ornstein, *supra* note 22.  The documents regarding Lucena are embedded within the article, available at https://www.propublica.org/documents/item/2475515-west-wilshire-phy-37949.html, at page 11.

[40] California State Board Pharmacy, "Change of Permit Request," https://www.propublica.org/documents/item/2475515-west-wilshire-phy-37949.html.

67.     In researching West Wilshire's relationship with Philidor, *Pro Publica* discovered that West Wilshire shared Philidor's toll-free customer assistance number and West Wilshire's website was hosted on a network belonging to Philidor.[41]

68.     West Wilshire's Pharmacy license was canceled by the California Board of Pharmacy on January 29, 2016.[42]   According to *Reuters*, two former Philidor employees were told by their managers that if claims submitted by Philidor were rejected, the employees should re-submit the claims using the National Provider Identification ("NPI") number for West Wilshire.[43]

69.     That this practice was routinely followed is illustrated by the fact that, in November 2014, pharmacy benefits manager, OptumRx, sent a cease and desist letter to Philidor for breach of contract.   Although that letter should have precluded Philidor from seeking any reimbursements for prescriptions on behalf of OptumRx clients, several months later OptumRx discovered that it was being billed by four pharmacies, each of which OptumRx found were linked to Philidor.[44]

70.     One former Philidor employee told *Reuters* that he had been instructed to bill OptumRx by using West Wilshire Pharmacy's NPI.   By early 2015, the employee said, Philidor had also directed employees to use the identification numbers of R&O in California, SafeRx in

---

[41] *See* Ornstein, *supra* note 22.

[42] California State Board of Pharmacy, License: "West Wilshire Pharmacy," http://www2.dca.ca.gov/pls/wllpub/WLLQRYNA$LCEV2.QueryView?P_LICENSE_NUMBER=37949 &P_LTE_ID=774.

[43] *See* O'Donnell, *supra* note 24.

[44] *See* O'Donnell, *supra* note 24.

New Jersey, and Orbit Pharmacy, Inc. in Texas to bill OptumRx.[45]  According to OptumRx, in January 2015, it sent cease and desist letters to all four of these pharmacies as well.

71.     Another former employee told *Reuters*, "Our main approach was to use West Wilshire's NPI." He continued, "We would sometimes still try to do it with Philidor's NPI, but we were pretty much always turned down, at which point we would use West Wilshire's."

72.     According to *Bloomberg News*, the instructions were memorialized in an employee manual:  "You will run across several insurances that we are not contracted with," the manual directed employees to "submit the NPI for our partner in California, West Wilshire Pharmacy," the manual said. "There is a good chance they are contracted."[46]

73.     On October 25, 2015, a Philidor spokeswoman told *The Wall Street Journal* that Philidor had an option to purchase West Wilshire Pharmacy, R&O, SafeRx, and Orbit Pharmacy Inc.[47]

### b.     Philidor Surreptitiously Forms Isolani to Acquire R&O, a California Pharmacy

74.     In another attempt to overcome its inability to secure the necessary license in California, Philidor formed Isolani as a limited liability company under Delaware Law on October 28, 2014.  Philidor then caused Isolani to acquire R&O, a licensed pharmacy in Camarillo, California.[48]  In court documents, Isolani admits that it was a single member LLC and that it was formed for the sole purpose of acquiring ownership of R & O.  Its sole member was

---

[45] *See* O'Donnell, *supra* note 24.

[46] Caroline Chen & Ben Elgin, "Philidor Said to Modify Prescriptions to Boost Valeant Sales," *Bloomberg News*, Oct. 29, 2015, http://www.bloomberg.com/news/articles/2015-10-29/philidor-said-to-modify-prescriptions-to-boost-valeant-sales.

[47] *See* Rockoff & Whalen, *supra* note 26.

[48] *R and O Pharmacy, LLC v. Valeant Pharmaceuticals North America LLC*, Case No. 15-07846, Dkt. 1, at ¶ 4 (C.D. Cal. Oct. 6, 2015).

Eric Rice ("Rice") who also served as Philidor's Senior Member of Call Operations.  R&O unwittingly became a part of Valeant's secret pharmacy network when it entered into a series of agreements with Isolani in December 2014.

75.    Among other things, R&O and its Pharmacist in Charge, Russell N. Reitz ("Reitz") entered into a Purchase and Sale Agreement on or about December 1, 2014 pursuant to which Isolani agreed to purchase 10% of R&O for $35,000 with an agreement to purchase the remaining 90% upon the satisfaction of certain terms, including most notably, Isolani obtaining a pharmacy permit from the California State Board of Pharmacy.

76.    At the same time, R&O and Isolani entered into a Management Services Agreement ("MSA") appointing Isolani as the manager of R&O Pharmacy, and delegating responsibility for the day-to-day operations of R&O to Isolani.  The MSA authorized Isolani to, among other things, order medications from Valeant, collect co-payments and reimbursements from insurance companies.

77.    Philidor and R&O also entered into a Prescription Drug Services Agreement allowing Philidor to deliver prescriptions to R&O which would then seek "authorization for fulfillment of the prescription and confirmation of coverage from the applicable insurance carrier, plan or other third party payer."   The Prescription Drug Services Agreement was signed by Eric Rice on behalf of R&O in his capacity as sole member of Isolani.

c.    **Philidor Creates Back Rank to Acquire an Interest in Texas-Based Orbit Pharmacy**

78.    On April 23, 2015, Philidor created Back Rank, LLC, a Delaware limited liability holding company.[49]   Back Rank's managing member was identified as James R. Fleming ("Fleming"), also Philidor's Controller and located at Philidor and BQ6's address.

79.    On or about June 2015, Fleming filed an application with the Texas Board of Pharmacy seeking to replace Segun Azeez Audu as the managing officer of Orbit Pharmacy.[50]

80.    On or about September 15, 2015, Philidor caused Back Rank to file a form for a location change for Orbit Pharmacy.[51]   Fleming, Philidor's controller, was identified in the application to the Texas State Board of Pharmacy and also executed the form on Orbit Pharmacy's behalf.   Fleming failed to disclose both his relationship with Philidor and that Philidor had been denied a license by the California Pharmacy Board.[52]   Among the paperwork attached to the application was an assignment and assumption of lease, executed on Back Rank's behalf by its General Counsel, Gretchen Wisehart.[53]   Ms. Wisehart's LinkedIn profile identifies her as Executive Vice President and General Counsel, Philidor Rx Services LLC.[54]

---

[49]    Department of State: Division of Corporations, State of Delaware, https://icis.corp.delaware.gov/Ecorp/EntitySearch/NameSearch.aspx (note: to access entity details, type in entity name "Back Rank, LLC" and file number "5734403" into General Information Name Search fields).

[50]    Texas State Board of Pharmacies, "Request to Change Location and/or Name of Pharmacy License," https://assets.documentcloud.org/documents/2491448/orbit-phy-26932-pharmacy-file.pdf.

[51]    Charles Ornstein, "When Buying Pharmacies, Valeant Affiliates Haven't Disclosed California License Denial," *Pro Publica*, Oct. 29, 2015, https://www.propublica.org/article/pharmacies-valeant-affiliates-not-disclosed-california-license-denial (documents reproduced at: https://www.propublica.org/documents/item/2491448-orbit-phy-26932-pharmacy-file.html).

[52]    *See* Texas State Board of Pharmacies, *supra* note 50.

[53]    *See* Texas State Board of Pharmacies, *supra* note 50.

[54]    Gretchen Sprigg Wisehart, LinkedIn, https://www.linkedin.com/in/gretchen-sprigg-wisehart-13934112.

81.     Like West Wilshire Pharmacy, Orbit Pharmacy shared Philidor's toll-free customer assistance number and Orbit Pharmacy's website was hosted on a network belonging to Philidor.[55]

### C.     Philidor Fraudulently Bills for Valeant Prescriptions

82.     Through the use of various "Patient Assistance" and "Alternative Fulfillment" programs, Valeant and its network of secret pharmacies sought to quell customer complaints that might have drawn unwanted scrutiny to their scheme by, among other things: concealing Valeant's relationship with a secret network of pharmacies; illegally altering physicians' prescriptions to make it appear that the physicians had specifically directed that they be filled with a Valeant drug; and filling prescriptions that were not requested while offering to reduce or eliminate co-pays to avoid patient complaints.  Indeed, many aspects of Defendants' fraudulent scheme were catalogued in manuals that were distributed to Philidor employees to guide their handling of claims submitted to TPPs. Those manuals explained to employees that "[w]e have a couple of different 'back door' approaches to receive payment from the insurance company."[56]

### 1.     The Valeant Enterprise's Use of False Pharmacy Identification

83.     Former Philidor employees have confirmed that they were provided with maps and detailed instructions that set out the particular false NPI information that should be submitted in the event of a denial relating to a particular dispensing pharmacy.  For instance, Defendants' claims handling manual instructed employees who received certain denials from TPPs were instructed to "submit the NPI for our partner in California, West Wilshire Pharmacy … There is

---

[55] John Carney, "Valeant, Philidor, R&O: What's In a Website?," *The Wall Street Journal*, Oct. 21, 2015, http://blogs.wsj.com/moneybeat/2015/10/21/valeant-philidor-ro-whats-in-a-website/.

[56] *See* Chen & Elgin, *supra* note 30.  *See also* Roddy Boyd, "The Pawn Isolated: Valeant, Philidor and the Annals of Fraud," Southern Investigative Reporting Foundation, Oct. 25, 2015, http://sirf-online.org/2015/10/25/the-kings-gambit-accepted-the-annals-of-fraud/.

a good chance they are contracted."  If a claim using West Wilshire's NPI was denied, the next step was to "add the Cambria Central Fill insurance and run that as the primary" – referring to one of Philidor's secret retail pharmacies located in Philadelphia, Pennsylvania.  "They should then get a paid claim and then Cambria … will reimburse us."[57]   In short, as summarized by *Bloomberg News*, Philidor employees were "instructed to submit claims under different pharmacy identification numbers if an insurer rejected Philidor's claim - - to essentially shop around for one that would be accepted."[58]

84.   Defendants also routinely caused other pharmacies in the Valeant network, including Isolani (discussed above), to use the NPI belonging to California-based R&O, yet another one of the pharmacies in Defendants' captive network, to bill TPPs for prescriptions R&O had never filled and, in some cases, for drugs R&O did not even stock.  Philidor used its network of pharmacies and/or their NPIs, to fill prescriptions and obtain reimbursements in states where Philidor was not licensed, including California.  Philidor also shipped Valeant drugs to states where neither Philidor nor the pharmacy associated with the NPI were licensed.

85.   This tactic has been widely described by former Philidor employees interviewed by *The Wall Street Journal* and *Bloomberg* News.  Moreover, in an interview with SIRF, Taylor Geohagan ("Geohagan"), a Philidor claims adjudicator during the Class Period, confirmed that this fraudulent practice was routinely implemented.  According to Geohagan, "[p]retty much

---

[57] Caroline Chen & Ben Elgin, "Philidor Said to Modify Prescriptions to Boost Valeant Sales," *Bloomberg News*, Oct. 29, 2015, http://www.bloomberg.com/news/articles/2015-10-29/philidor-said-to-modify-prescriptions-to-boost-valeant-sales.

[58] Caroline Chen & Ben Elgin, "Valeant's Philidor Used 'Back Door' Tactics to Boost Payments," Oct. 28, 2015.

everything we did in the [Philidor] Adjudication department was use the [NPI] codes from the pharmacies we bought out to get something [approved] in a pinch."[59]

86.     To conceal Defendants' use of false pharmacy identification numbers, Philidor and Valeant also certified and submitted false payor audits to TPPs (or to their PBMs) on behalf of the retail pharmacies with which they were secretly associated, for instance falsely representing that one pharmacy had filled certain prescriptions, when in fact those prescriptions had been filled by Philidor or one the other pharmacies in its secret network.

87.     Defendants and their agents also misrepresented their authority to approve the audit statements on behalf of the retail pharmacies and, in some cases, forged the signatures of principals at those pharmacies.  For example, as set forth in greater detail below, Russell Reitz – the owner and Pharmacist-in-Charge of R&O – told Eric Rice, Senior Director at Philidor, in a July 14, 2015 email that Philidor had billed R&O for prescriptions that were either "filled by some other pharmacy" or "were filled and billed before the execution of the R&O purchase and sale agreement" and thus fraudulently billed using Reitz's NCPDP number without his knowledge or consent.  Again, in some cases, these prescriptions were for drugs that R&O did not even stock.

## 2.     The Valeant Enterprise's Alteration of Prescriptions

88.     Another fraudulent billing scheme Defendants employed was to have Philidor employees to deliberately (and illegally) alter the prescribing doctor's instructions – to require that the prescription be filled with Valeant's brand-name drugs rather than less expensive generic substitutes.  Ordinarily, a pharmacist who receives a prescription for a branded drug will dispense a generic substitute if available.  In fact, pharmacists are required to do so by law in

---

[59] *See* Boyd, *supra* note 56.

fourteen states.  But doctors can indicate that the prescription be "dispensed as written," or "DAW," and order that no substitutions be made.  When TPPs denied reimbursement claims for Valeant-branded drugs, Philidor employees circumvented those denials by resubmitting the claims that falsely represented that the prescribing doctor had ordered that the prescription be DAW.  Moreover, Philidor employees falsely resubmitted these claims as new claims, misrepresenting the fact that these claims had previously been denied.

89.     Former Philidor employees have confirmed that pharmacies in Valeant's network, acting on written instructions in claims handling manuals issued by Defendants, routinely altered doctors' prescriptions in order to ensure that Valeant drugs were dispensed to more patients rather than less costly generic alternatives.[60]   This fraudulent practice was frequently implemented for certain key Valeant dermatologic drugs that encountered repeated denials from TPPs, such as Retin-A Micro and Vanos.  *Bloomberg News* has reported that an "undated Philidor document . . . provides a step-by-step guide on how to proceed when a prescription for Valeant dermatological cream and gels, including Retin-A Micro and Vanos is rejected. Similar instructions for changing the DAW indication are supplied for patients who are paying in cash." *Bloomberg* reported that ex-employees of Philidor confirmed prescriptions were altered as the document instructs and said the intent was to fill more prescriptions with Valeant products than generics.

### 3.     The Valeant Enterprise's Automatic Refill Program

90.     Another "back door" fraudulent billing practice implemented by Defendant Valeant and Philidor was the submission of unnecessary or unwanted prescription renewals for reimbursement, falsely representing to TPPs and their PBM agents that patients had requested

---

[60] *See* Chen & Elgin, *supra* note 46; Rockoff & Whalen, *supra* note 26.

renewals of their prescriptions when, in fact, they had not.  For example, as Philidor customers

have explained and as *New York Magazine* reported in a January 13, 2016 article, Defendants

caused Philidor and its captive network of pharmacies to automatically refill patients'

prescriptions for Jublia, among other Philidor-dispensed Valeant drugs, despite the fact that the

patients had not requested any refills.  Further, Defendants made it nearly impossible for patients

to decline or cancel those automatic refills.[61]   These unnecessary refills harmed consumers who

were forced to try to stop the automatic refill process, and the Class and Sub-Class because the

cost of these drugs was imposed on TPPs through the payment of additional claims for

unnecessary drugs.

91.     A Philidor employee explained in an online forum that Philidor "auto ship[ped]

[Valeant drugs] without proper approval, most people do not need these refills. The reason they

ship refills so fast is because it is free for the patient but Philidor gets anywhere from $550-

$1220 from the insurance companies."   Likewise, after the relationship between Valeant and

Philidor was revealed, a Philidor employee explained in an online forum that this scheme had

been jointly developed by Brad Greenfield, Director of Sales and Marketing for Valeant, and

Philidor executive Fabian Forrester-Charles, stating:

> They took the list of customers who had been approved by [insurance] and had
> refills available. Instead of waiting for the customer to call they would dial and
> leave a msg saying your refill will be shipped unless you call within 24 hrs. They
> would do this on the 30th day of the rx. Previously they had a Co pay so would
> have to wait to get approval to charge the 35.00 Co pay, making the Co pay 0
> allowed them to ship refills whether u wanted them or not. Not a bad money
> making idea except most people did not really need refills of Solodyn so soon . . .
> Of course these refills were out the door ASAP sometimes within an hour of the
> call and the [insurance] money would come in. What patients don't get is your
> [insurance] company is paying 500 plus bucks for an old medication reformulated

---

[61] Stephen Witt, "Valeant Pharmaceuticals' Novel Business Approach Made It a Wall Street Darling — Then a Pariah," *New York Magazine*, Jan. 13, 2016, http://nymag.com/daily/intelligencer/2016/01/valeant-wall-st-darling-to-pariah.html.

and refills not needed. I would bet a lot of solodyn and Jublia bottles are just lying around still in the shipping package. If you ever saw Wolves of Wallstreet well that was sorta what some of us saw at Philidor. Let's say on average a person does not need a refill of Solodyn for 45 or 60 days from the 1st fill and you force them to take it at 30 days every month $$$$$$$$$$$$$$$ and a ton of it! Think about it.[62] (emphasis added and all typographical errors in original)

92.    This fraudulent practice caused TPPs to pay for Valeant's dermatological drugs unnecessarily because the treatments are not designed for chronic illness and renewals are therefore unnecessary  The practice of waiving co-pays (detailed below), became integral to Philidor's automatic refill program because it ensured that patients would not complain about refills they had not requested.

93.    Even if these co-pay waivers seemed to protect consumers, that protection was short-lived.  As *The New York Times* reported, "even if patients are often shielded, the costs are paid by insurers, hospitals and taxpayers and lead to higher premiums and co-payments for everyone."[63]

94.    After assuaging the customers with waivers of co-payments, Defendants nevertheless reported to the TPPs the "actual charges" for Valeant drugs by failing to account for co-payments that had been waived.  The underlying premise of a co-payment is that customers will not over-utilize pharmacy benefits beyond those medically necessary.  Thus, co-payments are designed to nudge insureds to select generics when available and to only refill medications as

---

[62]    CafePharma Boards, Message Board Post, Oct. 27, 2015, http://cafepharma.com/boards/threads/can-someone-tell-me-what-the-philidor-valeant-relationship-is.585518/page-5#post-5542379; Linette Lopez, "If you ever saw Wolves of Wall Street well that was sorta what some of us saw at Philidor," *Business Insider*, Aug. 19, 2016, http://www.businessinsider.com/philidor-employees-in-t-rowe-price-slawsuit-2016-8.

[63]    Andrew Pollack & Sabrina Tavernise, "Valeant's Drug Price Strategy Enriches It, but Infuriates Patients and Lawmakers," *The New York Times*, October 4, 2015. http://www.nytimes.com/2015/10/05/business/valeants-drug-price-strategy-enriches-it-but-infuriates-patients-and-lawmakers.html?_r=0

needed.  Conversely, waiving co-pays discourages patients from actively avoiding low-value or medically unnecessary medicines.

95.     As a result, PBM contracts with pharmacies mandate that pharmacies make every attempt to collect the co-payment and submit claims reflecting their "actual charges," taking into account any discounts or waivers applied. Here, Defendants routinely waived co-pays for patients prescribed Valeant drugs, but when submitting claims for such prescriptions, falsely represented that the patient had been charged the full price of the drug.

### 4.     The Valeant Enterprise's Misrepresentations Directing Customers to Philidor

96.     Defendants also made misrepresentations directly to patients in order to boost Valeant's drug sales through its captive network of pharmacies by disseminating false statements (via brochures and coupons) to doctors and patients that promised patients Valeant drugs at no cost *only if* they submitted their prescriptions directly to Philidor.  By encouraging patients to submit claims directly to Philidor, Defendants were able to ensure that prescriptions for Valeant drugs would not be filled by a non-captive pharmacy that would substitute cheaper generic alternatives.  To induce these patients to take advantage of these discounts, the coupons falsely assured patients that their TPPs would not be billed.  For example, in consumer complaint filed with the Better Business Bureau on March 2, 2015, a patient wrote about Philidor:

> Complaint: Received a call from the [Philidor] representative stating that they wanted to refill a Rx for ******. They stated that they had a coupon that would pay for the medication completely, and even said "at no cost to you". Unfortunately, I said OK. In reviewing my healthcare plan claims, I noticed that they bill my Plan for $449.55. Since I have a $1500 deductible, I may be liable for this charge. This is not what I agreed to and not what the representative said would occur. I would like this claim removed from my healthcare plan immediately. I will return the ****** unopened in order to have this taken off my Claims.[64] (emphasis added and all typographical errors in original)

---

[64] Better Business Bureau, Customer Complaint, March 5, 2015, http://www.bbb.org/washington-dc-eastern-pa/business-reviews/pharmacies/philidor-rx-services-llc-in-hatboro-pa-236002214/complaints.

97.     TPPs were billed for these drugs.  As one patient reported in an online forum:

[M]y dermatologist provided me with a "Trial Coupon" for JUBLIA; a topical solution used to treat toenails. The trial coupon offers a '$0 co-pay for 12 months' of this medicine . . . . Philidor RX Services continues to INCORRECTLY bill my health insurance which, in turn, is impacting my HSA / MRA Funds - each time, removing $100 from MY Medical Reimbursement Account.[65] (Emphasis added and all typographical errors in original).

98.     Other customer complaints reported similar conduct, as reported to the Better Business Bureau:

Hello. My child had an appointment with a local dermatologist. While we were there we were referred to Philidor RX Services for filling two acne prescriptions. The dermatologist assured me that I would be charged only $25 and nothing more from our health insurance company. She also gave us a coupon to use for one of the prescriptions that would make it free. I called Philidor and gave them all of the information that was provided to me by the dermatologist. Philidor charged me $220 from my FSA account ($110 for each prescription). I contacted Philidor and spoke with a man who said his name was Mickey. Mickey told me that I needed to submit a statement from my insurance company showing that $220 was withdrawn from my FSA account. I did as requested and have sent the information via email to Philidor, Attn: Mickey, twice. I have received no response and no refund.[66]

99.     In furtherance of their fraudulent enterprise, Defendants also made it nearly impossible for patients to complain to Philidor about things such as the fact that their insurers had been billed in contravention of promises made in coupons and sales literature, or that they had received unrequested refills.  Despite the Company's massive investment in its sales force to promote Valeant-branded drugs, Philidor invested very little in creating a call center to handle

---

[65] Pissed Consumer, Customer Complaint, "Philidor Rx Services LLC took my HSA Funds!," Jan. 2, 2015, http://philidor-rx-services.pissedconsumer.com/philidor-rx-services-llc-took-my-hsa-funds-20150102577512.html.

[66] Linette Lopez, "The secret firm at the heart of Valeant's crisis has an alleged history of shady behavior with customers," *Business Insider*, Oct. 23, 2015, Business Insider http://www.businessinsider.com/philidor-valeant-consumer-complaints-2015-10.

customer complaints and problems.[67]  In fact, customers and patients would routinely report that they were directed to sales staff when they tried to report these problems.

### 5. The Valeant Enterprise's Manipulation to Achieve the Highest Customary Price and Volume an Insurer Would Accept

100.  Philidor instructed employees to manipulate the "usual and customary price"[68] of prescription drugs when adjudicating claims in an attempt to secure insurance payment for high-priced Valeant drugs, which was accomplished by repeatedly lowering the purported usual and customary price until the insurer's system accepted the claim.  Rather than accept payment at that price, Philidor employees were trained to raise the price again in order to pinpoint a plan's maximum allowable price.[69]

101.  Defendants also misrepresented the quantities of drugs in order to secure approval.  If a claim for reimbursement was rejected by the insurer, Philidor employees would resubmit the claim with a lower quantity of drugs so the price would be lower in order to secure insurance approval. The employee would then compensate for the lower quantity by increasing the number of prescription refills in order to secure the maximum reimbursement.

102.  Had Valeant not concealed its relationship with Philidor, and had Philidor not spread its prescriptions and reimbursement claims across the broad network of captive pharmacies, TPPs and/or their PBMs would have noticed that Philidor submitted an unusually high volume of claims for Valeant-branded drugs, and their high price points, which would have resulted in additional audits or claim rejections.

---

[67] Pissed Consumer, Customer Complaints, "Philidor Rx Services – Philidor won't answer the phone," Feb. 19, 2015, and Feb. 22, 2015, http://philidor-rx-services.pissedconsumer.com/.

[68] The usual and customary price represents the price the pharmacy would charge a cash-paying customer without insurance.

[69] *See* Rockoff & Whalen, *supra* note 26..

**D.     The Valeant Enterprise Begins to Unravel over a Dispute with R&O Pharmacy**

103.    As set forth above, in an effort to overcome the California State Board of Pharmacy's licensure denial, Philidor created a shell company called Isolani to acquire R&O, a licensed pharmacy in Camarillo, California.[70]  R&O and its Reitz, its owner and Pharmacist In Charge, unwittingly became entangled in the Valeant Enterprise when they entered into a series of agreements with Isolani, including a Purchase and Sale Agreement, on or about December 1, 2014.

104.    According to court documents, in December 2014, R&O began receiving orders for Valeant drugs from Philidor on behalf of R&O.  By the summer of 2015, Reitz began to suspect that he may have been the victim of a fraud after, as set forth in news reports, his "*modest prescription-filling business*" that he had agreed to sell for just $350,000 was flooded with "a *torrent of insurers' money . . . on a pace equal to $230 million a year, according to invoices.*"[71]

105.    On July 14, 2015, Reitz sent an email to Rice to "*address some very significant issues"* he said required Rice's "*immediate attention*," including that R&O's NPI number was being used to fill prescriptions for drugs that R&O did not stock and that these orders began *before* the Purchase and Sale Agreement was executed in December 2014:

> First and foremost, the issue of Philidor's improper and perhaps illegal use of **my NCDCP number** without my knowledge or consent to bill for prescriptions that were either:
>
> 1.  Filled by some other pharmacy (in some cases for drugs that R&O did not even stock or dispense); or

---

[70] *See* R&O Complaint, *supra* note 48.

[71] Melody Petersen & Stuart Pfeifer, "Pharmacist at center of Valeant scandal accuses drugmaker of 'massive fraud'," *The Los Angeles Times*, Oct. 31, 2015, http://www.latimes.com/business/la-fi-1101-valeant-pharmacy-20151101-story.html.

2.   were filled and billed before the execution of the R&O purchase and sale
agreement.

Reitz further complained that he had "been asked several times now to sign off on payer audits
that reflect these types transactions [sic]," despite the fact that he was "not aware of any
authority that would permit these types of practices."

106.   Reitz also demanded to know why Philidor/Isolani had failed to obtain, per the
terms of the Purchase and Sale Agreement, a temporary pharmacy permit from the California
State Board of Pharmacy some seven months after that agreement was signed.

107.   According to a July 20, 2015 email from Reitz to Andrew Davenport, Davenport
admitted the improper use of R&O's NPI number, but assured Reitz that he had "*ceased all
central processing involving R&O's NPI number.*"  Despite this assurance, Reitz told Davenport
that his previously noted concerns were "*far from allayed*" and that in fact, "*the materials
[Davenport] provided . . . raise far more questions than they answer*."

108.   Reitz also expressed confusion as to why Philidor, rather than Rice (Isolani) had
replied to him, prompting him to question the nature of the relationship between Philidor and
Isolani including, among other things, whether Philidor had a financial interest in Isolani.  Reitz
also specifically asked Davenport, "*[w]hat understanding, if any, is there between Philidor and
Isolani relative to R&O,*" and "*[w]hat financial or beneficial interest do you believe Philidor
has in R&O?*"

109.   In his lengthy email to Davenport, Reitz again demanded answers to the questions
and concerns he previously communicated to Rice, emphatically insisting that Davenport explain
why R&O's NPI number was being improperly used by the Philidor network.  Additionally,
Reitz said he had "just learned that Eric Rice signed off on the Argus-Humana audit, the same
audit I refused to sign."  Reitz went on to remind Davenport that "Eric Rice is not the PIC

[pharmacist-in-charge] (I am)," and more damningly, told Davenport that Rice "has never even stepped through R&O' s doors [so] I am not sure how he could verify the accuracy of anything pertaining to that audit."

110.   Reitz, likely concerned about his potential legal exposure as a result of the illegal practices he witnessed, terminated his agreements with Isolani as reflected in an August 31, 2015 from his attorney, Gary Kaufman ("Kaufman"), to Duane Morris LLP - - who apparently claimed to represent "Isolani and Philidor and all relevant employees," giving formal notice that "*Mr. Reitz and R & O **hereby terminate all of the Agreements, effective immediately**,*" (emphasis in original), referencing the Purchase and Sale Agreement, the MSA, a Business Associate Agreement between Isolani and R&O, and an offer of employment from Andrew Davenport to Reitz that was signed by Reitz on November 13, 2014.

111.   Kaufman's letter noted that "Mr. Reitz has detailed Isolani/Philidor and its representatives' fraud and malfeasance in painstaking detail . . ." adding that, "[t]hese letters and emails catalog Mr. Reitz's grave concerns regarding Isolani's relationship to Philidor and Valeant Pharmaceuticals International; *Isolani/Philidor's billing practices; the pressure that Isolani/Philidor placed on Mr. Reitz to sign blatantly false audit responses;* and other highly questionable conduct."   Kaufman's letter went on to succinctly and accurately describe what would not become apparent to Class members until months later - - that Defendants were engaged in a scheme to defraud insurers, and had used Reitz and R&O to carry out their illegal scheme.   In this regard, Kaufman explained:

> *It is now readily apparent that Isolani is simply a shell created by Philidor to perpetrate a massive fraud against not only Mr. Reitz and R&O, but also the California State Board of Pharmacy, various payer networks and as yet unknown entities and individuals.   Just a couple of months ago, Mr. Reitz discovered that in May of 2014, the California State Board of Pharmacy denied Philidor's application for a Nonresident Pharmacy Permit based on numerous false*

*statements in Philidor's application (a fact that Philidor never revealed to Mr. Reitz).*

*Thus, Philidor targeted Mr. Reitz and R & O back in the fall of 2014 because it needed access to R&O's valuable multi-state pharmacy licenses and payer contracts. Philidor then created Isolani as the instrumentality to improperly use R&O's NCPDP and NPI numbers to distribute pharmaceuticals in jurisdictions that Philidor would not have had access to but for R&O.*

*Several times now, Mr. Reitz has demanded that Isolani/Philidor cease the illegal use of R&O' s NCPDP and NPI numbers.  On July 19, 2015, Mr. Davenport provided Mr. Reitz with **written assurance** via email that Isolani/Philidor had ceased such activities . . .*

*Now, Mr. Reitz's worst fears have been realized, as he has obtained irrefutable proof that despite Mr. Davenport's assurances, Isolani/Philidor **continue to use R&O' s NCPDP and NPI numbers to bill payers for prescriptions dispensed by Philidor.***

*If that were not enough, Mr. Reitz now has concrete evidence that representatives of Isolani/Philidor have signed false and misleading payer audits and falsely represented themselves as officers or employees of R&O (which of course they are not) to certain payers. . . .*(Emphases in original).

112.    Notwithstanding this termination, on September 4, 2015, Valeant's General Counsel sent R&O a letter demanding $69 million it claimed R&O owed Valeant.  Four days later, Isolani filed suit against Reitz and R&O in California state court.

113.    A month later, R&O filed suit against Valeant in the United States District Court for the Central District of California.  It was apparently R&O's suit that began to shed light on the previously undisclosed relationship between Philidor and Valeant and, over the ensuing weeks, pressure intensified Valeant to explain its relationship to Philidor.  Information in R&O's suit also triggered reports by *The Wall Street Journal*, SIRF and Citron Research, all of which began to reveal the true relationship between Valeant and Philidor.  For example, in an October 19, 2015 report, SIRF pointed out and the extraordinary steps Philidor had taken to conceal its

true ownership.  SIRF described Philidor as a "key cog" in Valeant's "patient access" program and further revealed that Valeant was Philidor's only client.

### E.      Valeant Becomes the Target of Multiple Government Investigations

114.     As described above, Valeant has been the target of multiple government investigations.  Congress began investigating Defendants' price increases for Valeant drugs and Valeant's relationship to Philidor in 2015.  Both the House Committee on Oversight and Government Reform and the Senate Special Committee on Aging issued document requests and conducted interviews with Valeant employees.  Indeed, *Bloomberg News* reported that U.S. Representative Elijah Cummings wrote Pearson requesting that Pearson make Bijal Patel and certain others available for interviews based on allegations "that a group of Valeant employees helped launch Philidor's business in 2013 and have remained involved in its daily operations."

115.     Moreover, on February 29, 2016, Valeant announced that it was under investigation by the SEC in connection with its relationship with Philidor and that it was also being investigated by the U.S. Attorney's Offices for Massachusetts and the Southern District of New York. These investigations are currently ongoing. On April 27, 2016, the Special Committee held a hearing during which patients, doctors, Company executives and public health experts testified.  Pearson conceded that Valeant's strategy of dramatically raising the prices of its drugs was "too aggressive" – a strategy which Pearson admitted "was a mistake" which he "regret[ted] pursuing."

116.     More recently, on August 10, 2016, *The Wall Street Journal* reported that U.S. prosecutors had opened a criminal investigation into Valeant over whether it hid from insurers its relationships with Philidor that helped boost its drug sales.  Specifically, prosecutors are looking into whether Philidor made false statements to insurers about its ties to Valeant and whether insurers thought Philidor was neutral rather than in the service of Valeant.  The article reported

that the investigation could potentially lead to criminal charges against former Philidor executives and Valeant as a company.[72]

## V.      CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this class action on behalf of themselves individually and all others similarly situated pursuant to Federal Rule of Civil Procedure 23.

118.    The proposed Class consists of:

All health insurance companies, health maintenance organizations, self-funded health and welfare benefit plans, third party payors, and any other health benefit provider in the United States or its territories who paid or incurred costs for Valeant-branded products in connection with a claim submitted by a Philidor-affiliated pharmacy between January 2, 2013 and October 30, 2015 (the Class Period).  Excluded from the Class are Defendants and their affiliates.

119.    Plaintiffs also bring this class action on behalf of themselves individually and all other similarly situated New York purchasers pursuant to Federal Rule of Civil Procedure Rule 23 (the "New York Sub-Class")

120.    The members of the Class and New York Sub-Class are so numerous that joinder is impracticable.  The exact number of Class and Sub-Class members is unknown to Plaintiffs at this time.  Plaintiffs believe that there are thousands of members in the proposed Class.  Class and Sub-Class members will be identified from records maintained by Defendants and notified of this class action using a form of notice similar to that customarily used in class actions.

121.    Plaintiffs' claims are typical of the proposed Class and Sub-Class members' claims.  All members of the Class were similarly impacted by Defendants' conduct.

122.    Plaintiffs will fairly and adequately protect the interests of the proposed Class and Sub-Class members.  Plaintiffs have retained counsel experienced in corporate fraud and consumer class actions.

---

[72] *See* McNish & Matthews, *supra* note 6.

123.    Common questions of law and fact exist as to all proposed Class and Sub-Class members and predominate over any other questions affecting particular members.   Among the common questions are:

- Whether Defendant Valeant violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c);

- Whether all Defendants conspired to violate RICO, *id.* § 1962(c), in violation of 18 U.S.C. § 1962(d);

- Whether Defendants made false or misleading statements or omissions that concealed Valeant and Philidor's relationship with a network of pharmacies;

- Whether Defendants changed codes on prescriptions when submitting claims to Plaintiff and the proposed Class members so that those prescriptions would be filled with Valeant-branded products rather than generic alternatives;

- Whether Defendants submitted prescription renewals for reimbursement, falsely representing that the particular patient had requested renewal of his or her prescription;

- Whether Defendants used false pharmacy identification information to allow its affiliated pharmacies to dispense Valeant's branded drugs;

- Whether Defendants submitted false and misleading payer audits to third party payors on behalf of retail pharmacies with which they secretly associated;

- Whether Defendants routinely waived co-pays for patients prescribed Valeant-branded products, but then falsely represented that the patient had been charged the full price of the drug to the third party payors;

- Whether Defendants conduct constitute a "pattern of racketeering activity," *see* 18 U.S.C. §§ 1961, 1962;

- Whether Defendants administered an "enterprise," *see* 18 U.S.C. § 1962;

- Whether Defendants' conduct affected interstate commerce, *see* 18 U.S.C. § 1962; and

- Whether the business or property of Plaintiff and the proposed Class members were injured "by reason of" Defendants' conduct, *see* 18 U.S.C. § 1964(c).

- Whether Defendant Valeant violated New York's Consumer Protection Act, N.Y. Gen Bus. Law § 349, *et seq*. and injured the New York sub-class as a result.

124.    A class action is a method superior to all others available for the fair and efficient adjudication of this action.    Joinder of all proposed Class and Sub-Class members is impracticable.    The damage suffered by particular proposed Class and Sub-Class members may be relatively small so that the burden and expense of individual litigation makes it impossible for those members to redress the wrong done to them individually.    There will be no difficulty in the management of this action as a class action.

## VI.    CLAIMS FOR RELIEF

### COUNT ONE

### (AGAINST DEFENDANT VALEANT)

### VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

125.    Plaintiffs incorporate by reference all preceding paragraphs.

126.    This Count is asserted on behalf of all members of the proposed Class against Defendant Valeant for violation of the Racketeer Influenced and Corrupt Organizations  Act, 18 U.S.C. § 1962(c).

127.    At all times relevant hereto, Defendant Valeant is and has been a "person" within the meaning of §1961(3) of RICO, who conducted the affairs of the Valeant Enterprise, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

128.    The Valeant Enterprise is an enterprise within the meaning of 18 U.S.C. § 1961(4).  It is a group of entities and individuals associated in fact: as a continuing unit acting for a common purpose of profiting by inflating the number and cost of prescriptions for Valeant-branded drugs written, filled, and reimbursed by members of the proposed Class during the Class Period.  The Valeant Enterprise is comprised of multiple known and unknown individuals and entities, including defendant Valeant, defendants Andrew and Matthew Davenport, Philidor, KGA, BQ6 Media Group, End Game Partnership L.P., Lucena LLC, Isolani, R&O, Orbit, and Back Rank LLC, and their respective employees and agents.  All entities and individuals comprising the Valeant Enterprise are "persons" within the meaning of 18 U.S.C. § 1961(3).  All entities and individuals comprising the Valeant Enterprise existed separate and apart from the Valeant Enterprise itself and from the pattern of racketeering activity.  The Valeant Enterprise had an ongoing organization with a framework for carrying out its objectives.

129.    The Valeant Enterprise engaged in – and its activities affected – interstate commerce.  Defendant Valeant and the pharmacies comprising the Valeant Enterprise dispensed pharmaceuticals throughout the United States to thousands of patients, and submitted claims for reimbursement to TPPs (and members of the proposed Class) throughout the United States.

130.    Defendant Valeant was associated with the Valeant Enterprise: it was aware of the general existence and nature of the Enterprise, it was aware that the Enterprise extended beyond Valeant's individual role, it knowingly participated in and furthered the Enterprise's activities, and it had an ownership interest in the Valeant Enterprise.

131.    Defendant Valeant conducted the Valeant Enterprise's affairs and knowingly participated in the conduct of the Enterprise's affairs.  It took some part in the operation or management of the Enterprise's affairs and had some role in directing the Enterprise's affairs.

132.     Defendant Valeant knowingly conducted or participated in the conduct of the Valeant Enterprise's affairs through a pattern of racketeering activity.   Defendant Valeant committed at least two acts of racketeering activity over the course of the proposed Class Period. The acts of racketeering were related to each other: they had the same or similar purposes, results, participants, victims, methods of commission, and were interrelated by distinguishing characteristics.   The acts of racketeering amounted to continued criminal activity: there was a series of related racketeering acts committed over a substantial period of time, *i.e.*, the proposed Class Period.

133.     Defendant Valeant conducted or participated in the conduct of the enterprise's affairs "through" the pattern of racketeering activity; the acts of racketeering activity had a relationship and meaningful connection to the Valeant Enterprise.

134.     Valeant conducted and participated in the affairs of the Valeant Enterprise through patterns of racketeering activity, including acts indictable under 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1343 (wire fraud), and 18 U.S.C. § 1952 (use of interstate facilities in aid of racketeering).   Defendant knowingly devised and willfully participated in a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises, and willfully participated in such a scheme with knowledge of its fraudulent nature. Defendant acted with the intent to defraud, *i.e.*, knowingly and with the intention or the purpose to deceive or to cheat Plaintiffs and members of the proposed Class out of money.   In advancing, furthering, and carrying out the scheme, Defendant used the mails or caused the mails to be used. *See* 18 U.S.C. § 1341.   Valeant knowingly devised a scheme to defraud or to obtain money or property by materially false of fraudulent pretenses, representations of promises, and willfully participated in such a scheme with knowledge of its fraudulent nature.   Valeant acted with the

intent to defraud.  In advancing, furthering, and carrying out the scheme, Valeant transmitted writings, signals, and sounds by means of a wire in interstate commerce or caused the transmission of writings, signals, and sounds of some kind by means of a wire in interstate commerce.  *See* 18 U.S.C. § 1343.  Defendant used the mail and facilities in interstate commerce on multiple occasions with the intent to distribute the proceeds of unlawful activity, and to otherwise promote, manage, establish, carry on, and facilitate the promotion, management, establishment, and carrying on of unlawful activity related to the Defendant's business enterprise.  *See* 18 U.S.C. § 1952.

135.    The predicate violations described were committed for the overall purpose of obtaining maximum reimbursement from Plaintiffs and members of the Class for exorbitantly priced Valeant-brand products by any means necessary.  Defendant Valeant's scheme involved, among other things: (i) charging exorbitant prices for Valeant-branded drugs; (ii) improperly substituting Valeant-branded drugs for generic equivalents that were prescribed and should have been dispensed, often by physically altering physicians' prescriptions; (iii) routing prescriptions through the secretly controlled pharmacy network and illegally resubmitting rejected claims through other pharmacies, to make it appear that the claims were new; and (iv) secretly and unlawfully waiving patient co-pays and offering other incentives to discourage patients from requesting less expensive generic alternatives.

136.    Defendant Valeant used the mail, wire, and interstate means to make false and misleading statements to Plaintiffs, the Class members, regulators, patients, prescribing physicians, and other pharmacies to effectuate each component of their scheme by, among other things: engaging in deceptive practices to ensure patients received higher-priced Valeant-branded drugs and prevent the substitution of cheaper generic equivalents, including changing codes on

prescriptions, falsifying pharmacy identification information in invoices for prescriptions, falsifying prescription renewals for reimbursement, using pharmacies within the Valeant Enterprise to enable Philidor to indirectly operate in states where it had been denied a license, and making uniform misrepresentations in advertisements and marketing materials; channeling prescriptions for Valeant drugs, including those seemingly dispensed by smaller retail pharmacies in their captive network through Philidor, to ensure that Valeant-branded drugs were dispensed instead of generic equivalents, thereby inflating Valeant's revenues at the expense of the Class; knowingly and willfully misrepresenting to state regulators the ownership and control of the captive pharmacies that constituted the Valeant Enterprise; and receiving fraudulently-secured proceeds from Plaintiffs and Class members.

137.    Plaintiffs and the proposed Class were injured in their business and property by reason of Valeant's violation of 18 U.S.C. § 1962.  Plaintiffs and the proposed Class members suffered injury to their business or property because they paid millions of dollars in reimbursements for Valeant-branded products that were sold as an actual and proximate cause of Valeant's racketeering activities.

## COUNT TWO

## (AGAINST ALL DEFENDANTS)

## VIOLATIONS OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d) – CONSPIRACY

138.    Plaintiffs incorporate by reference all preceding paragraphs.

139.    This Count is asserted on behalf of all members of the proposed Class against all Defendants for violation  of the Racketeer Influenced  and Corrupt Organizations  Act, 18 U.S.C. § 1962(d).

140.     Defendants conspired to violate 18 U.S.C. § 1962(c) by knowingly agreeing to facilitate a scheme which included the operation or management of the Valeant Enterprise.

141.     Defendants agreed – amongst themselves and with others – to violate 18 U.S.C. § 1962(c).  Defendants, their employees and agents, and other unknown agents engaged by Defendants to inflate Valeant's drug sales knowingly agreed, combined, and conspired to conduct and participate in the conduct of the Valeant Enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of 18 U.S.C. §1341 (mail fraud), 18 U.S.C. §1343 (wire fraud), and 18 U.S.C. §1952 (use of interstate facilities in aid of racketeering), including: (1) making false and misleading statements to state regulators in order to conceal Valeant's relationship with a network of captive pharmacies, which Defendants used to insulate Valeant's drugs from generic competition; (2) making  false and  misleading statements to  Plaintiffs and  the Class  in order to fraudulently secure, or maximize, reimbursement for prescriptions written and filled for Valeant's drugs (including  falsifying prescriptions,  making  claims  for  refills  that  were  never  requested  by patients, and misrepresenting the identity of dispensing pharmacies in order to bypass denials of claims for Valeant drugs); and (3) making false and misleading statements to patients and prescribing physicians that fraudulently induced them to request and prescribe Valeant drugs instead of cheaper generic alternatives.

142.     Defendants undertook that agreement knowing of its objective to conduct or participate, directly or indirectly, in the conduct of the Valeant Enterprise's affairs through a pattern of racketeering activity, and they intended to join together with at least one other alleged conspirator to achieve that objective.  Defendants shared a unity of purpose and the intent to achieve the objective of conducting or participating in the conduct of the Valeant Enterprise's

affairs through a pattern of racketeering activity.  In particular, Defendants knew and agreed to act in furtherance of the Valeant Enterprise's common purpose: to inflate the cost and the number of prescriptions for Valeant's branded drugs written, filled, and reimbursed during the Class Period by issuing a variety of false and misleading statements to numerous different constituencies in order to obtain money and benefits for participants in, and associates of, the Valeant Enterprise at the expense of Plaintiffs and the Class.

143.   Defendants entered into a conspiracy or agreement to violate 18 U.S.C. § 1962(c), *i.e.*, to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity, deliberately joined or became a member of the conspiracy or agreement with knowledge of its purpose, and agreed that someone would commit at least two of the racketeering acts described above.

144.   Defendants agreed to participate in the affairs of the Valeant Enterprise, *i.e.*, shared a unity of purpose and the intent to achieve the objective of participating in the conduct of the Valeant Enterprise's affairs through a pattern of racketeering activity.  Defendants knew and agreed to act in furtherance of the Valeant Enterprise's common purpose: to maximize reimbursement for exorbitantly-priced Valeant-branded drugs.  Defendants' joined that conspiracy with knowledge of its purpose and agreed that members of the conspiracy would commit multiple acts of racketeering described above.  Among other things, Defendants:  (i) charged exorbitant prices for Valeant-branded drugs; (ii) submitted reimbursements for those high-priced drugs by setting up a secret captive pharmacy network through which the orders and reimbursements were routed; (iii) coordinated amongst one another and made false statements to regulators to obscure the existence of the Valeant Enterprise's secret pharmacy network; (iv) illegally and improperly substituted Valeant-branded products in place of generic equivalents

that were prescribed and often times required by statute; (v) waived patient co-pays and offered incentives to discourage patients from complaining about Defendants' deceptive practices and requesting less expensive generic alternatives; (vi) submitted claims for refills that were never requested; (vii) made statements to physicians to steer them towards use of Philidor to enable the Valeant Enterprise's scheme; (viii) engineered Valeant's control over Philidor by means of an option held by KGA to acquire Philidor; (ix) constructed the captive pharmacy network; and (x) embedded Valeant employees and agents at Philidor to effectuate the scheme to defraud Plaintiffs, the Class members, physicians, patients, and insurers.

145.    Plaintiffs and the proposed Class were injured in their business and property by reason of Defendants' violation of 18 U.S.C. § 1962(d).  Plaintiffs and the proposed Class members suffered injury to their business or property because they paid millions of dollars in reimbursements for Valeant-branded products that were sold as an actual and proximate cause of Defendants' agreement to engage in a violation of 18 U.S.C. § 1962(d).

## COUNT THREE

## (AGAINST DEFENDANT VALEANT)

## VIOLATIONS OF NEW YORK DECEPTIVE PRACTICES ACT, N.Y. GEN. BUS. LAW § 349, *et. seq.*

146.    Plaintiffs incorporate by reference all preceding paragraphs.

147.    Plaintiffs assert this Count individually and on behalf of all members of the New York state sub-class against Defendant Valeant for violation of New York's Consumer Protection Act, N.Y. Gen. Bus. Law § 349 *et seq.*

148.    By the acts and conduct alleged herein, Defendant Valeant committed unfair or deceptive acts designed to charge exorbitant prices for Valeant-branded drugs.

149.   Defendant Valeant's unfair or deceptive acts were consumer-oriented and caused manifest harm to the public at large, as evidenced by the multiple government investigations that were initiated in 2015.

150.   Defendant Valeant purchased orphan drugs that already faced little competition, then through a host of fraudulent practices and by providing false information to consumers and the market that their revenue growth was attributable to volume rather than price hikes, Valeant induced consumers to purchase Valeant-branded drugs while materially over-charging for those prescriptions.  These activities were contrary to the public interest.

151.   In addition to practices that harmed the public at large, Defendant Valeant injured Plaintiffs and the New York sub-class regularly and continuously by: (i) illegally or improperly substituting Valeant-branded drugs for generic equivalents that were prescribed and should have been dispensed, often by physically altering physicians' prescriptions; (ii) charging exorbitant prices for Valeant-branded drugs; (iii) routing prescriptions through its secretly controlled pharmacy network and illegally resubmitted rejected claims through other pharmacies, to make it appear that the claims were new; and (iv) secretly waiving patient co-pays and offering other incentives to discourage patients from requesting less expensive generic alternatives.

152.   Defendant Valeant's misconduct would have misled both a reasonable consumer acting reasonably under the circumstances and a reasonably payor acting reasonably under the circumstances as Valeant intentionally concealed its astronomic price hikes on Valeant-branded drugs and its clandestine relationships with the Philidor pharmacy network.  These business practices reinforce the misleading effect of Valeant's deception.

153.   Plaintiffs and the New York sub-class suffered actual injury by reason of Defendant Valeant's materially deceptive or misleading conduct.  Plaintiffs and the proposed

Class members paid:  (i) monies to Defendant Valeant for Valeant-branded drugs that they would not otherwise have paid; and (ii) vastly inflated prices for Valeant-branded drugs because the Valeant Enterprise enabled Defendant Valeant to sell those drugs at a premium.  Plaintiffs and the New York sub-class would not have over-paid for Valeant-branded prescriptions but for and as a proximate cause of Defendant Valeant's unlawful and deceptive conduct.

154.   Plaintiffs and proposed New York sub-class members suffered actual injury by reason of Defendants' violation of N.Y. Gen. Bus. Law § 349(a), and therefore are entitled to recover actual damages or fifty dollars, whichever is greater, as well as damages three times the actual damages, and reasonable attorney fees.  *See* N.Y. Gen. Bus. Law § 349(h).

## VII.   PRAYER FOR RELIEF

Plaintiffs pray for relief and judgment against Defendants jointly and severally as follows:

1. Certify this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. Pursuant to Plaintiffs' RICO Act claims, awarding Plaintiffs and the proposed Class compensatory and treble damages, in an amount to be proven at trial, including interest thereon;

3. Pursuant to Plaintiffs' New York state law claims, awarding Plaintiffs and the proposed Class compensatory damages, in an amount to proven at trial, including interest thereon, actual damages, statutory damages (if applicable), treble damages, and attorney fees;

4. Awarding Plaintiffs and the proposed Class reasonable costs and expenses, including attorney and expert fees; and

5. Awarding any other relief the Court deems just and proper.

## VIII.   JURY TRIAL DEMAND

Plaintiffs demand a trial by jury for all issues so triable.

Dated:  August 29, 2016                    Respectfully submitted,

                                           COHEN MILSTEIN SELLERS & TOLL PLLC

                                           */s/ Christopher Lometti*
                                           Christopher Lometti (CL9124)
                                           Joel P. Laitman (JL8177)
                                           88 Pine Street, 14th Floor
                                           New York, New York 10005
                                           Telephone: (212) 838-7797
                                           Facsimile: (212) 838-7745

                                           Steven J. Toll
                                           Julie Goldsmith Reiser
                                           1100 New York Ave NW
                                           Suite 500 West
                                           Washington, DC 20005
                                           Telephone: (202) 408-4600
                                           Facsimile: (202) 408-4699

                                           ***Attorneys for New York Hotel Trades Council &
                                           Hotel Association of New York City, Inc. Health
                                           Benefits Fund***

                                           BARRACK, RODOS & BACINE

                                           */s/ A. Arnold Gershon*
                                           A. Arnold Gershon (AG3809)
                                           William J. Ban (WB0382)
                                           Eleven Times Square
                                           640 8th Avenue, 10th Floor
                                           New York, NY 10036
                                           Telephone: (212) 688–0782

                                           Jeffrey W. Golan
                                           Jeffrey A. Barrack (JB8668)
                                           Julie B. Palley
                                           3300 Two Commerce Square
                                           2001 Market Street
                                           Philadelphia, PA 19103
                                           Telephone: (215) 963-0600
                                           Fax: (215) 963-0838

                                           ***Attorneys for the Detectives Endowment Association
                                           of New York City***